**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 22-cr-251 (ABJ)** |
| **v.** | : | |
| | : | |
| **LINWOOD ALAN ROBINSON, SR.,** | : | |
| | : | |
| **LINWOOD ALAN ROBINSON II,** | : | |
| | : | |
| **BRITTANY ROBINSON, and** | : | |
| | : | |
| **BENJAMIN ROBINSON,** | : | |
| | : | |
| **Defendants.** | : | |

**GOVERNMENT'S CONSOLIDATED SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this consolidated sentencing memorandum in connection with the four Robinson defendants.[1] For the reasons set forth herein, the government requests that this Court sentence defendants Linwood Alan Robinson, Sr., Linwood Alan Robinson II, and Brittany Robinson to 90 days' incarceration, and Benjamin Robinson to 120 days' incarceration, and impose 36 months' probation, 60 hours of community service, and $500 in restitution for each defendant—sentences that are in line with those imposed in comparable misdemeanor cases where the defendants engaged in similar misconduct.[2]

---

[1] Following the Court's suggestion at the change of plea hearings for these four defendants, the United States is submitting one consolidated sentencing memo applicable to all four of the Robinson defendants, rather than repeating many of the same facts, exhibits, and arguments in separate memoranda.

[2] See below at Section IV.E for a discussion of the custodial sentences imposed on similarly situated defendants at the Speaker's Lobby who pled guilty to misdemeanor offenses.

## I.      Introduction

The Robinson defendants, Linwood Alan Robinson, Sr. ("Linwood Sr."), his son Linwood Alan Robinson II ("Linwood II"). Linwood II's wife Brittany Robinson ("Brittany"), and Linwood Sr.'s son and Linwood II's brother Benjamin Robinson ("Benjamin"), all participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[3]

All four of the Robinson defendants pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of incarceration followed by probation is appropriate in this case because all four defendants (1) acted as ringleaders to the violent and unruly mob, directing the crowd to the Speaker's Lobby hallway where one rioter was fatally shot as a result of their collective effort to enter the House chamber; (2) traveled throughout the Capitol including into sensitive areas like the Speaker of the House's office suite despite police officers' desperate efforts to clear the building; (3) have each demonstrated a callous lack of regard for the consequences of their actions, starting immediately after the riot when Benjamin posted "They heard today" to Facebook and again shortly after their arrests in May 2022 when Benjmin and Linwood Sr. attempted to fundraise by claiming to a reporter that the FBI terrorized the family;

---

[3] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

(4) as to Benjamin, engaged in violence when he kicked at the Speaker's Lobby door even after police officers inside the House Chamber had drawn their weapons and prepared to shoot the invading mob; and (5) as recently as June 2023, months after their guilty pleas, each of the Robinson defendants refused to accept responsibility or express any kind of remorse for the illegality of their actions.

The Court must also consider that the defendants' conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for their actions alongside so many others, the riot likely would have failed. Here, the defendants' participation in a riot that succeeded in halting the Congressional certification combined with their lack of remorse, revisionist recollections of the events, and the potential for future violence renders significant jail sentences both necessary and appropriate in this case.

## II.    Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 68, 71, 74, and 77 (Statements of Offense), at ¶¶ 1-7.

### *The Robinson Family's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, five members of the Robinson family, Linwood Sr., Linwood II, Brittany, Benjamin, and Linwood Sr.'s 17-year-old grandson (Linwood II and Benjamin's nephew) drove together from their homes in South Carolina to the Washington, D.C. area. The drive took approximately 6½ to 7 hours to a relative's house in Northern Virginia, where they spent the night. On the morning of January 6, they took the Metro to D.C. and attended the Stop the Steal rally, where they watched then-President Trump speak. When Trump finished, all five

members of the Robinson family marched together from the National Mall to the U.S. Capitol building.

The Robinsons approached the Capitol building from the west, crossing the battleground on the West Front to reach the building from the Upper West Terrace (UWT). At the time the Robinsons crossed the west lawn to the Northwest Stairs, rioters were violently engaging with police officers who were fighting to hold back the mob. Officers used pepper spray, smoke bombs, audible warnings to leave, and other crowd control measures that made it unmistakable that the West Front was no place for a peaceful demonstration. Despite this, the Robinson defendants, along with their minor family member, climbed under the construction scaffolding and up the Northwest Stairs to approach the building. The Robinsons can be seen in video footage making their way under the scaffolding that had been set up on those stairs to accommodate the inaugural stage. *See* Figure 1.1; Exhibit J ("4z3SiPE3gdYo.mp4," also available at https://web.archive.org/web/20210111060238/https://video.parler.com/4z/3S/4z3SiPE3gdYo.mp4).   The scaffolding, which was then still under construction, was swarming with rioters in, around, and on the structure as the Robinson family climbed the stairs toward the UWT. The crowd broke through a number of police lines—including one that held for several minutes at the top of the scaffolding and another at the top of the Northwest Stairs—by assaulting the police, wresting bike racks out of the hands of police officers, and forcing their way through and past those barricades.



*Figure 1.1 (excerpt of Exhibit J at timestamp 0:52): Benjamin (red) and Linwood Sr. (yellow) pointing toward Linwood II (green) and his nephew as they approach the scaffolding*

U.S. Capitol Police (USCP) surveillance footage shows the Robinsons reaching the UWT at around 2:15 p.m. The building was first breached at 2:13 p.m. by rioters who broke windows at the Senate Wing Door to gain access to the building. It was just three minutes after this first breach, as the building was surrounded by a violent mob and clearly under siege, that the Robinson family took their opportunity to join the crowd and breach the building. Linwood II, Brittany, and their minor nephew entered the building through the Northwest courtyard side fire door, also known as the Parliamentarian's Door, on the UWT at 2:16 p.m. ECF 71, 77, at ¶ 11.

Once the window was smashed and the door was breached, and after Linwood II and Brittany entered the building, police responded to the area. Benjamin, who was in the doorway but

had not yet made his way fully inside, saw this unfolding as the police arrived on the UWT where he stood. He urgently waived at his brother Linwood II, sister-in-law Brittany, and minor nephew to retreat when he saw the police officers approaching. ECF 71, 74, 77, at ¶ 11.

Linwood II, Brittany, and their nephew saw Benjamin's warning and quickly heeded his call, running out of the building to avoid the police. Linwood II grabbed Brittany's sweatshirt by the hood to quickly drag her out the door. *See id.*; *see also* Figure 1; Exhibit A (USCP CCTV from Parliamentarian Door, also available at https://archive.org/details/tNcbjyPffT6weAMk2).



*Figure 1 (excerpt of Exhibit A at timestamp 01:57): Benjamin (red), in doorway, waves Linwood II (green), Brittany (blue), and their nephew back outside, just before police arrive and direct the rioters to leave.*

By that time, having already ignored countless warning signs and violence on the West Front, the Robinson family defendants were fully aware that the police were struggling to keep rioters out of the building and to regain control. But none of the Robinson family defendants heeded those warning signs. Immediately after Benjamin saw the police approaching and Linwood II and Brittany fled the Parliamentarian's Door, the group was looking for another entrance. They

quickly found one, the nearby Senate Wing Door, which had been breached by shattered glass and broken door hardware less than five minutes earlier.

At the doorway, alarms were blaring. Broken glass blanketed the floors. Furniture was strewn on the ground below the windows. And no police officers were present to stop the crowd from advancing. Linwood Sr., Linwood II, and Brittany entered first, as seen in Figure 2. Benjamin and his nephew surveyed the damaged window just outside the door before they entered through the same Senate Wing Door a few moments later, as seen in Figure 3 and Exhibit B ("InsideCapitol.mov," also available at https://www.dropbox.com/s/8ps9nmf3ycvkp49/Inside Capitol.mov).



*Figure 2: Linwood Sr. (yellow), Linwood II (green), and Brittany (blue) enter at 2:17 p.m.*



*Figure 3 (excerpt of Exhibit B at timestamp 8:38): Benjamin, left (in tan jacket), with his minor nephew, assesses the broken window next to the Senate Wing Door immediately prior to entering; Linwood Sr.'s jacket can be seen inside the broken window*

Just inside the door, while alarms blared, rioters chanted, "Whose House?" Brittany, standing next to Linwood Sr. and then Linwood II, lowered her mask and screamed, "Our House!!" Brittany's loud screaming rose above even the cacophonous crowd. *See* Figures 4, 5; Exhibit B.



*Figure 4 (excerpt of Exhibit B at timestamp 08:48): Brittany and Linwood Sr. just after the family entered through the Senate Wing Door*

8



*Figure 5 (excerpt of Exhibit B at timestamp 08:56): Brittany, Linwood II, and their nephew (left) marching with the crowd, chanting, "Whose House? Our House!" as they head toward the Crypt*

From there, all five Robinson family members went down the hall to the Crypt on the first floor and were part of the group that breached the police line to gain access to the rest of the building. They faced off with the police close to the very front of the mob, as seen in Figure 6.



*Figure 6: Linwood Sr. (yellow) and Linwood II (green) facing off with police in the Crypt*

Eventually, the Robinsons and the mob succeeded in breaking through the police line to gain access to the rest of the building. *See* Exhibit B, approx. timestamp 15:20 to 16:01 (showing the mob breach the police line; Linwood II (at 16:01 and 16:44) and Linwood Sr. (at 16:44) can be seen in the crush of rioters). The mob screamed and intimidated the police, eventually forcing them back with physical assaults and the strength of their vast numbers.

After breaching this police line, the Robinsons walked together down the hallway toward the House Wing Door, then up the small spiral stairs to the corridor west of the Rotunda and Statuary Hall where the Speaker's office is located. They walked into the Speaker's office suite, where members of the Speaker's staff were sheltering in place, terrified. *See* https://www.businessinsider.com/pelosi-staff-barricaded-themselves-in-room-as-rioters-looted-office-2021-1. There, the rioters evaded surveillance cameras, so the government is unaware of their activities inside those offices. The Robinsons remained in the Speaker's office suite for a few moments and exited from across the suite through a different door.

After leaving the Speaker's office suite, the Robinsons walked through Statuary Hall to join a growing crowd amassing outside of the House Chamber. At around 2:40 p.m., the Robinsons were part of a crowd of rioters attempting to break into the House Chamber. Linwood II can be seen in USCP surveillance footage outside the main House door, shown in Figure 7. This crowd had already barreled through a line of eight or more U.S. Capitol Police officers defending the Chamber's main entrance. *See* Exhibit D (USCP CCTV at House Main Door Hall), at timestamp 0:00 (showing the mob force the police line back).



*Figure 7: Linwood II (green) approaching the House Chamber door from Statuary Hall*

Fortunately, this crowd wase stymied by the firm set of locked doors, and the entrance was

barricaded from the inside, as shown in Figure 8, taken from inside the House Chamber.



*Figure 8: Inside the House Chamber as a large crowd amassed outside the main door*

The Robinson defendants recognized that the crowd was unable to advance to the House floor from that location, so they formed a kind of advance team looking for an alternative route. They left the crowd at the main House Chamber door and proceeded up the hallway to the side of the Chamber. *See* Exhibit D, at timestamp 4:40. There, joined by rioter Zachary Alam[4] (wearing a black t-shirt and a fur hat with earflaps), the Robinson defendants encountered a Capitol employee[5] and engaged with him for a few moments, as shown in Figure 9 and Exhibit C (USCP CCTV at East hallway). It was clear that the hallway was weakly guarded by a woefully inadequate number of officials.



*Figure 9 (excerpt from Exhibit C, timestamp 0:30): Linwood II (green), Brittany (blue), Benjamin (red), with Linwood Sr. (offscreen) and their minor nephew, engaging with U.S. Capitol employee (indicated with white arrow) in hallway to the east of the House Chamber*

---

[4] Accused rioter Zachary Alam, D.D.C. No. 21-cr-190 (DLF), who allegedly punched the windows of the Speaker's Lobby door with his bare hands until the glass broke and then smashed through the glass with a helmet, has pleaded not guilty and is scheduled for trial on July 31, 2023. *See* Minute Order, Jan. 26, 2023.

[5] That employee was interviewed, and recalled He recalled that Alam and others (he did not recall the Robinsons in particular) asked him where to find the bathroom. He believed that the rioters did not know where they were. He noted that Alam in particular was extremely agitated. He did not report escorting anyone to the bathroom; instead, he said he was there to slow down the group of rioters that was advancing through the Capitol building in an effort to allow members of Congress to evacuate the building. This employee, who is not a police officer, was unarmed and had no arrest powers.

Immediately following this encounter, Linwood II, Brittany, and Benjamin rushed back to the crowd at the House chamber door and vigorously waved to the rioters to follow them, as shown in Figures 10, 11, and 12, and Exhibits C and D. Notably, they did not continue down the hall in search of a bathroom (as Brittany later reported to the FBI), nor did they look around for an exit (which would have been easy to find, as it was right nearby). They rushed back to flag down the crowd, imploring the mob to join them down this east hallway that led directly to the Speaker's Lobby and an alternative entrance to the House Chamber.

 

*Figure 10 (excerpt from Exhibit C, timestamp 0:56): Linwood II (green) and Brittany (blue), turn back to summon the crowd*

*Figure 11 (excerpt from Exhibit C, timestamp 0:59): Benjamin (red), Brittany (blue), and Linwood Sr. (yellow) round the corner and wave the crowd to follow (with Linwood II just ahead, out of the frame)*



*Figure 12 (excerpt from Exhibit D, timestamp 5:34): Linwood II summons the mob gathered at the main House Chamber door to follow him down the east hallway to the Speaker's Lobby*



*Figure 13: Map of south side of second floor of the Capitol, with red arrow delineating the Robinsons' path from Statuary Hall toward the Speaker's Lobby, and red star showing the location where the Robinsons summoned the crowd to follow toward Speaker's Lobby*

Just as the Robinsons evidently intended, the large mob of rioters followed them down the hallway toward the Speaker's Lobby. As they advanced down the hallway, Linwood II and Brittany saw a group of rioters outside the building, behind an exterior door, attempting to breach yet another doorway to further overrun the Capitol building. *See* Exhibit E ("RMG News" video clip), at timestamp 0:45. Linwood II and Brittany took a brief detour toward that exterior door, as if to assist those rioters to enter the building. When another rioter arrived there first and opened the door, allowing a fresh set of rioters to stream in, Linwood II and Brittany celebrated and turned back to continue their advance to the Speaker's Lobby. *Id.*; *see* Figure 14.



*Figure 14 (excerpt of Exhibit E, timestamp 0:50): Brittany (with Linwood II, left, partly outside frame) celebrating after a new swarm of rioters gained entry to the building at the east hallway*

The Robinsons made no effort to leave out that available exit.  As the video footage shows, the exterior door was not packed with rioters and the Robinson defendants had every opportunity to leave. But clearly their aim was not to leave (as they later reported to the FBI), but to continue deeper into the interior of the Capitol, where the House had just suspended its session and where Members of Congress were sheltering in place and hiding for their lives.

From that mid-point of the east hallway, with a growing crowd, all five Robinson family members rushed toward the Speaker's Lobby door. The Robinson defendants were among the people closest to the internal doorway to the House. Three officers with no protective hard gear and insufficient means to keep the rioters at bay guarded the windowed doorway leading to the House. Linwood Sr. was directly in front of the officers, as the crowd around him and the other Robinson defendants chanted, "Break it down!  Break it down!"  *See* Figure 15; Exhibit F ("TheResistance.Video" video clip).



*Figure 15 (excerpt of Exhibit F, timestamp 1:52): Linwood Sr. near the front of the mob at the Speaker's Lobby door (with Zachary Alam to his right, in fur hat), shortly before the three outmatched officers were forced to retreat*

Benjamin announced to the crowd, "Everybody, they're leaving," and Brittany joined in, "They're leaving!"  *See* Exhibit G ("Insurgence USA" video clip), at timestamp 1:22. Next to Benjamin, Zachary Alam, furiously angry, punched the glass windows with his bare fists. The three officers attempting to protect the Speaker's Lobby Door were forced to retreat due to the escalating violence from the crowd. As they left, another rioter moved in to break open the glass window with a wooden pole. A small team of SWAT officers arrived and advanced toward the doorway.

Then, multiple people warned the group, "he's got a gun," or simply, "gun," referring to the officers on the other side of the glass-paned door. *See* Exhibit E, at timestamp 3:40. Just after that warning, Benjamin, who was at the front of the mob immediately in front of the Speaker's Lobby doors, kicked the door as other rioters hit it with their hands and with weapons, as shown in Figure 16. Benjamin admitted in his plea agreement that he "used his body and foot to pound the door." ECF 74, at ¶ 15. This was nearly simultaneous to another rioter, later identified as Ashli

Babbitt, climbing up and through the broken window. A shot was fired, and Babbitt, who had been struck, fell back from the open window to the ground; she died from the single shot. All five Robinson family members then left the area and exited the building together through the southeast doors at approximately 2:46 p.m. *Id.*



*Figure 16 (excerpt from Exhibit E, timestamp 3:43): Benjamin, in front of the crowd, pounded the Speaker's Lobby Door with his body and foot after rioters shouted, "he's got a gun" (referring to police inside the House Chamber)*

As the Robinson defendants left the building, Benjamin told another person in the crowd, "they just killed somebody at the fucking door." *See* Exhibit H ("20210106_144258.mp4" video), timestamp 3:12. Brittany reported that the police shot someone right in front of all of them, and that "they pointed a gun right at him," referring to Benjamin. *Id.*, at timestamp 3:26. As they recounted the shooting, none of the Robinson defendants displayed any remorse for their contribution to the violence.

*Benjamin's Social Media Posts*

As part of the investigation, the FBI recovered fragments of Benjamin's Facebook activity, made in the hours following the attack on the Capitol. At an unknown time on January 6, Benjamin

posted a photo of the Capitol dome and the caption, "They heard today[.]" In the days that followed, he boasted that he "watched a girl get shot for standing at the door wanting to speak to the senates," along with a photo of the outside of the Capitol building overrun by rioters. He shared screenshots and video links and told his Facebook friends that the police "pointed the gun in my face I look down the barrel and then I rolled out of the window and he shot[.]" But by January 16, 2021, Benjamin was striking a different tone in his Facebook communications. To one friend, he asked, "what did you do to get all of your picture's from faceboook [sic] [?]" The friend responded with a link entitled, "How to Permanently Delete Facebook Account 2020."

*Morningstar Journal News*

The four Robinson defendants were arrested shortly after 6:00 a.m. on May 19, 2022, without incident. The FBI had a warrant to search Benjamin's home, but not the homes of the other three Robinson defendants. They took Benjamin into custody without incident and spoke with his wife briefly. Before interviewing Benjamin's wife, the agents explained that she was free to leave and could decline the interview or stop answering questions at any time. Benjamin's wife indicated that she understood, and after a brief discussion she told the agents she preferred to leave. They assisted in loading her car with items she asked for from the home, and she left at around 6:51 a.m.

The following day, a representative of MorningStar Journal News interviewed Linwood Sr., his wife, and Benjamin outside of Linwood Sr.'s home. Exhibit I ("MorningStar Interview," also available at https://www.youtube.com/watch?v=BjgCIx5vG0E). Benjamin reported that agents banged loudly on his door at 5:00 am, and agents told him not to move or he would be shot. *Id.*, timestamp 03:58. He claimed that FBI agents dragged him off the porch and that they pulled his wife out at gunpoint. *Id.* The FBI agents who were present at Benjamin's arrest, however, dispute important aspects of this account. According to the agents on the scene, no agent ever told

19

Benjamin or anyone in his family that they would be shot. While they did approach the house with weapons drawn, according to the search agents they followed FBI procedures that apply universally to FBI search and arrest operations. Benjamin, Linwood Sr., and their families were treated in the same manner as other defendants in criminal cases.

During this interview, Linwood Sr. and his wife indicated that the family was raising money on the crowdsource fundraising site GiveSendGo.com for what they believed would be $100,000 in legal fees. *Id.*, timestamp 09:50. Linwood Sr. claimed that the FBI was engaged in a smear campaign to "make us ashamed of what we stood up for."  *Id*., timestamp 10:50. Referring to his conduct on January 6, Linwood Sr. insisted, "I am not ashamed of what I stood up for."  *Id.* The interview was posted to YouTube with the caption, "FBI Terrorizes Family Over Jan 6 Misdemeanor Charges."  *Id*.

### *The Robinson Defendant's Interviews*

Pursuant to their plea agreements, each of the Robinson defendants gave an interview to the FBI on June 12, 2023.[6]  Before the interview, which took place in the presence of the Robinsons' attorney, each defendant was warned that it was imperative that they tell the truth if they chose to answer any questions, and they were advised that they could face additional criminal charges if they knowingly gave false answers to the FBI. Each of the Robinsons agreed, but, as discussed next, each of the Robinsons gave false information during their interviews.

---

[6] These interviews were overtly video-recorded by the FBI, who met with the defendants in person. But that recording was unbeknownst to government counsel or counsel for the defendants, who appeared at the interviews by videoconference. Government counsel learned that the FBI had recorded the interviews shortly after they concluded and immediately notified defense counsel.

### A.  Linwood Robinson Sr.'s Interview

Linwood Sr. recounted that he decided to go to Washington, D.C. because he was upset about what was going on in the country and he wanted his voice to be heard. He and his family members, including his co-defendants and his then-minor grandson, attended the Trump rally at the Ellipse. After the rally, Linwood Sr. explained they went to the Capitol because that's where the Senators and Representatives were meeting to certify the results of the Presidential election. He likened his plans to march to the Capitol building to historic marches organized by Dr. Martin Luther King, Jr.

When they arrived, according to Linwood Sr., there were police officers just inside the door who told the group to come on in, but that they had to be respectful and not break anything. Linwood Sr. claimed that he heard one of the officers say something, so he asked his family members to repeat what he had said, and they confirmed the officer had told them they could come inside. In his interview, Linwood Sr. claimed he had reviewed a video of this very event, which his daughter-in-law had, but he claimed he did not know where the video came from and he was unable to provide it to the FBI agents. Despite subsequent efforts by the government to obtain this video from Linwood Sr. (through counsel), he never produced it. Counsel for the Robinsons did produce nine video files that may be the videos referenced by Linwood Sr. (and Brittany, described below). But the videos do not show any police officers in view of the Robinson family expressing any authorization for rioters to enter or remain on Capitol grounds.

Describing his journey through the Capitol building, Linwood Sr. said he followed the crowd and wound up in Speaker Pelosi's office. He claimed he saw people destroying things and trashing the office and that he told those people, "cut the crap."  At that point, he recalled, he began looking for a way to get out of the building, to avoid being trampled. They went upstairs to the

third floor, came back downstairs, and found themselves in a room that Linwood Sr. assumed was the Rotunda. There, according to Linwood Sr.'s account, he saw a man in a blue blazer who he assumed worked in the building, though the man did not say so. Looking for a way to leave, he claimed he followed the man, who seemed to pass Linwood Sr. and his family off to a woman in professional clothes. Linwood Sr. described that the woman continued to lead them, though he did not describe where or why. As they looked for a way out, according to Linwood Sr., he and his family found themselves at the Speaker's Lobby door. Linwood Sr. maintained that they were there looking for an exit.

Linwood Sr. acknowledged that they passed a doorway—the same door they ultimately exited from—but he claimed there were too many people crowding the doorway in an effort to get *into* the building, so he concluded it would not make a viable exit. After they crammed into the Speaker's Lobby hallway, and after a woman was shot, news of the shooting spread like fire through the crowd, and Linwood Sr.'s family was able to use that door to exit the building. He claimed they got their bearings at that point and left the Capitol grounds not long after.

Linwood Sr.'s interview statements are inconsistent with the video evidence and with the statements he made in his change of plea hearing and Statement of Offense, ECF 68. No police officers can be seen at the Senate Wing doorway around the time Linwood Sr. and his family entered the building. No video known to the government shows the police in that area inviting the Robinson family to enter; on the contrary, Capitol Police officers were desperately trying to hold back the rioters and ultimately lost that effort in the Crypt.

In his Statement of Offense in support of his guilty plea, Linwood Sr. admitted that when he entered the Capitol building, he knew he did not have permission to do so. ECF 68, at ⁋ 16. Further, he admitted he was "part of the group that breached the police line in the Crypt to gain

access to the rest of the building." *Id.* at ⁋ 13. As for Linwood Sr.'s description of two mysterious characters silently leading his family through the building like Alice in Wonderland, his claim is entirely inconsistent with any known evidence. Video shows Linwood Sr. and his family approached a blazer-clad man *for the first time* at approximately 2:40 p.m. in the hallway just outside the Speaker's Lobby door. Then, the Robinsons summoned the crowd in their direction when they assessed that the hallway was insufficiently guarded by any police presence. They did not follow that man anywhere. No footage shows Linwood Sr. attempting to leave; instead, his family celebrated as more rioters streamed in. Only after shots were fired very near to Linwood Sr. and his family did he make any known effort to leave the building.

### B.  Defendant Brittany Robinson's Interview

Brittany reported that she went to D.C. with the rest of the Robinson group because she had never been to a Trump rally, and she didn't want to stay home, so the night before they left she decided to join the family in D.C. She stated she went to the Capitol building because that was part of the rally; in her mind, it was all one event.

When she got to the Capitol building, Brittany described walking into a single door (the Parliamentarian Door), but when she entered she saw almost nobody inside, so she turned around and walked out (back to the Upper West Terrace). Then she and the rest of the family went to the Senate Wing Door, where she said more people were entering. Brittany claimed that police officers were standing at the Senate Wing Door allowing people to enter. She claimed there were multiple officers standing inside the Senate Wing Doors when Brittany and her family entered. As she described it, one of those officers said to Brittany, "you can be here, you just can't touch anything." Brittany was shown a photo, taken from CCTV footage at the Senate Wing Door at approximately 2:17 p.m., and asked to identify where the officers had been. At that point, Brittany recanted her

first description and stated that the officers who told her she could come inside were actually further down the hall, out of view of that CCTV camera.

Brittany claimed that she had seen a couple of videos online where officers said to other rioters, "come on in." But she acknowledged that she wasn't seen in any of those videos that she had reviewed. A few days after the interview, through counsel, the Robinsons provided nine videos, described above. But these do not show officers in any area near where Brittany entered the Capitol.

As for her time inside the Capitol building, Brittany acknowledged entering Speaker Pelosi's office. She saw someone light a cigarette there and recalled that everyone in the room told that person to put the cigarette out. She didn't recall more details about Speaker Pelosi's office, nor about where she and the family went after that.

Brittany claimed that she approached a Capitol employee and told him she was lost and looking for the bathroom. She claimed that this employee took her, Linwood II, and their nephew to find the bathroom, which was down the hallway toward the Speaker's Lobby. She further claimed that this employee, who escorted them to the bathroom, waited while she and her nephew used the facilities, just before another rioter was shot.

When asked about her waving to the crowd to draw them toward the hallway to the Speaker's Lobby, Brittany simply claimed she could not recall doing so.

Brittany's version of these events is inconsistent with incontrovertible video evidence and with her Statement of Offense in support of her guilty plea. She first breached the building through the Parliamentarian Door, but admitted, under oath, that she "ran out of the building as Benjamin urgently waved at the group to withdraw as the police approached." ECF 77, at ¶ 11. Just two minutes later, she entered again, now on clear notice that the police did *not* want the violent, riotous

24

mob to take over the Capitol building. She admitted that she "willfully and knowingly entered the U.S. Capitol Building knowing that she did not have permission to do so." *Id.* at ⁋ 16. And she admitted that she was "part of the group that breached the police line in the Crypt to gain access to the rest of the building." *Id.* at ⁋ 13.

Brittany's story about her search for a bathroom also ignores important and inconsistent details. First, video footage shows that after she engaged with the Capitol employee, Brittany ran back the opposite direction and waved the rest of the crowd forward to follow her. The employee did not lead or escort her anywhere. Once the mob from the main House door began following Brittany and her family, they led the crowd toward the Speaker's Lobby themselves, stopping  to cheer as others broke the door open to allow yet more rioters to enter the building. Outside the Speaker's Lobby, footage shows Brittany in the crowd at the door—just at the time she claimed to be in the bathroom. *See* Figure 17; Exhibit F, at timestamp 1:40; Exhibit G, at timestamp 1:22.



*Figure 17 (excerpt of Exhibit F, timestamp 1:40): Brittany (blue, far left), with Linwood II (green), immediately outside the Speaker's Lobby Door, not in the bathroom as she claimed*

And just moments later, outside the building talking with others, Brittany's contemporaneous statement that officers "shot someone in front of all of us" and "pointed a gun right at [Benjamin]" while "we were all right there," Exhibit H, timestamp 03:40, indicates that she was not, in fact, on any escorted bathroom visit. She was near enough to see the officers draw their weapons at the rioters and witness the shooting.

### C.  Defendant Linwood Robinson II's Interview

Linwood II explained that he went to Washington, D.C. to protest what he saw as a stolen election. On the morning of January 6, he and his family went to the National Mall and listened to Trump's entire speech. Afterwards, Linwood II reported that they all went to the Capitol as part of the event. Initially in the interview, Linwood II claimed they went in the building with the crowd and had to keep moving. But he also reported that the first time he entered the building (through the Parliamentarian Door), he followed two police officers who were entering the building. He said there were not many people there, so he and his other family members came back out.

Linwood II stated that he and his family entered a second time, through the Senate Wing Door, because that's where the crowd was going. He claimed that almost immediately after they entered, a police officer suggested they were allowed to be there. Linwood II claimed this officer told him that he and his fellow rioters were going to be heard and said to be respectful.

Once they entered, Linwood II described that people were just walking through the building so he and his group just went with the flow of traffic. He claimed that is how they wound up in Speaker Pelosi's office. In the Speaker's office suite, he reported that he saw someone use a fire poker to smash a glass table.

Linwood II was asked to describe what happened as he and his family made their way toward the House chamber and the hallway leading toward the Speaker's Lobby door. In particular,

he was asked about his waving to the crowd to draw them around the corner and ultimately to the Speaker's Lobby door. Linwood II claimed during his interview that he waved the crowd over to let them know there was an exit and a bathroom in that direction. Asked why he believed that the crowd was looking for an exit and a bathroom, Linwood II's explanation was that he heard people in the crowd asking.

As with his co-defendants, Linwood II's interview statements are not only internally inconsistent, but also inconsistent with the video evidence and with his prior admissions. In his Statement of Offense in support of his plea agreement, Linwood II admitted that he "ran" out of the Parliamentarian Door as Benjamin "urgently waved at the group to withdraw as the police approached." ECF 71, at ¶ 11. He also admitted that "he willfully and knowingly entered the U.S. Capitol Building knowing that he did not have permission to do so." *Id.* at ¶ 16. His claim that he waved the crowd from the House main door to the Speaker's Lobby hallway simply to show the mob where to find the bathroom is, much like Brittany's story, unbelievable. The mob at the Speaker's Lobby door shouting, "Break it down!  Break it down," most certainly was not looking for an exit or a bathroom, and Linwood II knew that.

### D.  Defendant Benjamin Robinson's Interview

In his interview, Benjamin reported that he went to Washington, D.C. to hear Trump's speech. Trump told the crowd they were all going to march to the Capitol to be heard, and that's what the crowd did. Benjamin reported that he couldn't remember how he got to the Capitol and couldn't recall the scaffolding that was set up on the grounds.

At the entrance to the building, the family was separated for a short time, but then they all entered the building together. When they were by the door, Benjamin reported that he saw an FBI agent, wearing a blue rain jacket with the letters "FBI" on the front pocket and on the back,

directing people in the door. According to Benjamin, this FBI agent signaled them to come inside. When they walked inside, he saw two SWAT officers on his right who directed him down the hall. Benjamin claimed that because of this, he believed it was okay to be there inside the Capitol building. He also claimed that once they were inside, Capitol Police were directing them where to go, indicating that the rioters were authorized to be there. Inside, Benjamin reported that an officer told them they were allowed to be there, but that they couldn't break anything.

In Speaker Pelosi's office, Benjamin recalled seeing people tear up papers. He described the scene there as chaotic, and claimed he tried to tell people to stop.

Benjamin acknowledged that he and his family wound up in the hallway toward the Speaker's Lobby. Benjamin claimed he didn't remember waving to anyone in the crowd, and if people were waving, it was probably his family waving to Benjamin to come join them.

At the Speaker's Lobby door, Benjamin described that he was just standing there watching people, waiting for his family to use the bathroom. He saw other people banging on the door to the House chamber. He said he saw a man breaking the glass window inside the door and claimed that he tried to gently place a piece of glass that had been removed from the window on the ground. Benjamin claimed he didn't pound on the door.

Benjamin reported that he no longer had the phone he used on January 6, because it was destroyed in a work accident when an automobile transmission fell on top of it. He acknowledged that he did use social media on January 6, and that he had posted from the Capitol, "They heard today." Interpreting that post, he said he felt like "the DC people" heard from the American people that day.

Agents asked Benjamin about the Facebook message he sent on January 16, 2021 (asking how to "get all of your picture's from Facebook") and the instructions he received in response

(describing "How to Permanently Delete Facebook Account 2020"). Benjamin claimed he only wanted to recover family photos so he could print them out. He said that, although the link he was provided in response related to deleting a Facebook account, that was not what he intended to do.

Benjamin was asked whether he and co-defendants Linwood Sr., Linwood II, and Brittany had discussed their interviews or the answers they would provide to the FBI before the interviews. He denied doing so.

Much like his family members' statements, Benjamin's interview claims are entirely inconsistent with the evidence. In his Statement of Offense in support of his guilty plea, Benjamin, like his co-defendants, admitted that he urgently waved his family members out of the Parliamentarian Door to encourage them to withdraw as the police approached. ECF 74, at ¶ 11. Benjamin admitted, under oath, that he "willfully and knowingly entered the U.S. Capitol Building knowing that he did not have permission to do so." *Id.* at ¶ 16.

Even more troubling, he admitted—consistent with video footage—that at the Speaker's Lobby door, after rioters had broken open the glass window, he "used his body and foot to pound the door." *Id.* at ¶ 15. The video footage corroborates this and contradicts Benjamin's recent insistence that he was simply standing there waiting for his family to emerge from the bathroom. First, video shows that his family members were there with him, in the same hallway, participating in the same riot. Second, Benjamin was not a passive observer. He was front and center, among the first line of rioters at the Speaker's Lobby door—close enough that as Brittany recalled immediately after the fact, the police pointed a gun at him. Benjamin, kicking at the House chamber door as Members waited for an opportunity to evacuate, was a serious threat to their lives and safety.

### *The Charges and Plea Agreements*

On May 16, 2022, the United States charged all four Robinson family defendants by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. § 5104(e)(2)(D) and (G). All four defendants were arrested on May 19, 2022, at their homes in Indian Land, South Carolina (Linwood Sr., Linwood II, and Brittany) and nearby Matthews, North Carolina (Benjamin). On July 20, 2022, the United States charged all four defendants by a four-count Information with violating the same four offenses. On April 13 and 14, 2023, pursuant to plea agreements, all four Robinson defendants pleaded guilty to Count Four of the Information, charging them with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. By plea agreement, all four defendants agreed to pay $500 in restitution to the Architect of the Capitol.

### III.     Statutory Penalties

The four Robinson defendants now face sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. As noted by the plea agreements and the U.S. Probation Office, the defendants face up to six months of imprisonment and a fine of up to $5,000. The defendants must also pay restitution under the terms of each defendant's plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the

Section 3553(a) factors weigh in favor of 90 days' incarceration and 36 months' probation for each defendant.

### E.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing the Robinson defendants' participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for misdemeanor defendants like the Robinsons, the lack of violent or destructive acts is not a mitigating factor. Had they engaged in such conduct, each of the Robinson defendants would have faced additional criminal charges.

The Robinsons, acting in concert throughout their time in and around the U.S. Capitol, engaged in conduct more serious and aggravated than most misdemeanor defendants. They entered the building minutes after it was first breached, discovered that police were chasing rioters away, retreated, and then quickly entered again from a second location. At the Senate Wing Door, which they entered less than five minutes after the first rioters smashed the windows and jumped inside, the Robinsons encountered shattered glass and overturned furniture, blaring alarms, and utter chaos. They screamed and chanted as they joined the crowd in the Crypt to force their way through the police line. They entered one of the most sensitive spaces in the Capitol Building, the offices of Speaker Nancy Pelosi—one of the primary targets of the violent rhetoric that day. And they watched, by their own admission, as rioters trashed the office suite.

At that point, even Linwood Sr. believed they were at risk of being trampled—but the family did not leave. They continued their pursuit, and eventually found a weak point in the Capitol security. As soon as they identified that vulnerability, they summoned the mob from the main House Chamber door and caused a flood of violent rioters to swarm the hallway outside the Speaker's Lobby. At the door, rioters viciously attacked the door and terrorized the outmatched police officers; the Robinson defendants joined in at the front of the mob. The officers were left outnumbered and overwhelmed, and the Robinsons took advantage of their power when Benjamin announced to the crowd "they're leaving!" After those officers retreated, Benjamin kicked at the door which formed the very last line of defense protecting the Members of Congress sheltering in the House Chamber. Many rioters contributed to the fatal shooting that followed. That included the Robinsons, who eagerly waved the crowd to that area and were front and center with the police at the door, and in particular Benjamin, who continued the mob's effort to "break it down" when he pounded on the door just as the police were forced to use their weapons.

After the riot ended and the world reacted in horror, Benjamin basked in what he apparently saw as an accomplishment. Of the four defendants, only Benjamin's social media account was recovered, and even that contained only fragments. Days after the riot, Benjamin asked a Facebook friend how to get pictures off Facebook and received a tutorial to "Permanently Delete Facebook Account."

An additional significant aggravating factor in this case is the Robinson defendants' willingness to rewrite history and recount false tropes casting themselves as innocent participants in a police-sanctioned protest. Each of the Robinson defendants lied in their interviews with FBI agents in this case, even *after* they had signed plea agreements, entered guilty pleas under oath before this Court, and were warned before their interviews that lying to the FBI agents was a

federal crime. More than two years after the insurrection at the Capitol, not only did each of the Robinson defendants deny or minimize his or her own culpability—they went further and concocted increasingly outlandish tales. They blamed the Capitol Police officers. They pointed to nonexistent SWAT teams and blazered mystery men. They claimed the FBI, in television-worthy FBI windbreakers, invited them into the building. And in a news interview (during which they tried to fundraise for their own defense), Benjamin claimed, falsely, that the FBI threatened to shoot him and his family. None of this is true, all of it is dangerous, and each of the Robinson defendants is responsible for propagating these lies.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of significant incarceration for each of the Robinson defendants.

### F.   The History and Characteristics of the Defendants

#### a.   Linwood Alan Robinson, Sr.

As set forth in the PSR, ECF 86, Linwood Sr. works as a mechanic at the family business, R & D Automotive, which he built and currently operates. PSR ⁋ 46, 49. His criminal history consists of a 1981 conviction, at the age of 18, for simple assault and criminal mischief; his 60-day custodial sentence was suspended and no further information about the offense is available. PSR ⁋ 25-26. In 2019, at the age of 56, Linwood Sr. was arrested following an assault at the care facility where his elderly father resides.  According to the PSR, he was seen on surveillance footage yelling at his sister and shoving her, then grabbing a nurse by the arms. PSR ⁋ 27. Police determined that Linwood Sr. was the predominate physical aggressor and he was charged with Domestic Violence Simple Assault. Linwood Sr. pled guilty and the case was dismissed after one year of good behavior. *Id.* Linwood Sr. has been compliant with the terms of his pretrial release in this case.

Linwood Sr.'s recent assault arrest makes his conduct on January 6 all the more troubling. Moreover, as the family patriarch who owns the business where Linwood II and Benjamin both work, he bears an added responsibility for leading the group. Particularly blameworthy was his allowing his minor grandson to join the adults as they forced their way through the Capitol amidst violence, chaos, and even the shooting death of another rioter. Linwood Sr.'s decision to lead his family through the Capitol, combined with his recent demonstration of anger and physical violence in his 2019 arrest and his lack of any remorse or acknowledgement of the recklessness of his actions here, demonstrates the need for a custodial sentence in this case.

### b.  Linwood Alan Robinson II

Linwood II also has a criminal history, with two convictions for possession of drug paraphernalia, one of which resulted in a suspended sentence of 45 days in custody. PSR, ECF 88, at ¶ 25, 26. According to the PSR, he was found in possession of opium, cocaine, and marijuana in 2012, and heroin in 2014. *Id.* He also has a 2019 arrest for intimidation in an incident with his brother Benjamin. PSR ¶ 28. In addition, according to the PSR, Linwood II and Benjamin were issued complaints when a third party reported that the two brothers threatened to kill him and beat him to the ground after the third party damaged Linwood II's vehicle. *Id.* The disposition of that case is unknown. *Id.*

Linwood II reported that he is in recovery from his addiction to heroin and opiates, in part due to treatment programs he received following his criminal convictions. PSR at ¶ 44, 46. Despite this progress, he was issued a complaint in 2019 when police responded to an incident of threats (the third party reporting the incident also reported prior encounters with the Robinson family). *Id.* at ¶ 28. This recent history, combined with Linwood II's conduct on January 6, willingness to engage in a dangerous riot along with his father, wife, brother, and his minor nephew, are troubling,

and demonstrate the need for a serious consequence that includes incarceration.

### c. Brittany Robinson

According to the PSR, ECF 92, Brittany Robinson has no criminal history and she has been compliant with the conditions of release in this case. ⁋ 28-33. Nevertheless, Brittany's history and characteristics indicate that a sentence of incarceration is important in this case. As noted above, Brittany, like her co-defendants, lied to the FBI in her post-plea interview, insisting that the police allowed if not encouraged her to enter the Capitol. Her account of the Capitol employee who escorted her to the bathroom is entirely blind to the serious and deadly consequences of her actions that day.

### d. Benjamin Robinson

Benjamin Robinson works as a mechanic at R & D Automotive. According to the PSR, ECF 90, Benjamin has no criminal convictions. ⁋ 29-33. He has one 2016 arrest, at the age of 18, for malicious injury to personal property and contributing to the delinquency of a minor when he and an unidentified 15-year-old damaged the front-yard decoration of a third party. ⁋ 34. This arrest apparently did not deter Benjamin to again participating in criminal activity with a minor when, on January 6, he and his family members took their minor nephew throughout the Capitol despite the violent riot that surrounded them. Like Brittany, Benjamin's history and characteristics indicate that a sentence of incarceration is important, as Benjamin continues to minimize his conduct and his culpability, providing false information to the FBI during his post-plea interview.

### G. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United*

*States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### H.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that

behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

     *Specific Deterrence*

     This case presents an especially acute need for specific deterrence because none of the four Robinson defendants has shown any remorse for their illegal actions—even though they witnessed first-hand the deadly consequences the violent riot caused. Instead of expressing regret for their actions or even concern for their minor relative's well-being, each of the Robinsons has shown defiance. Linwood Sr. proudly told a reporter, 16 months after the riot, "I'm not ashamed of what I stood up for"—while trying to raise money off that same interview. Linwood II, who led the charge to summon the crowd over toward the Speaker's Lobby, now flips history on its head to claim he was helping the rioters to *exit* the building, a claim that is clearly false. Brittany has concocted her own alternate reality, claiming that officers allowed rioters to enter, essentially welcoming them into the besieged building during a session of Congress that decides the fate of our democracy. Benjamin immediately flaunted his pride on the evening of January 6, when he posted to Facebook that "They heard today"—and he has maintained his pride even despite apparently concluding that he would remove evidence of his activities from Facebook.

## I.   The Need to Avoid Unwarranted Sentencing Disparities

The government has charged more than a thousand individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[7] This Court must sentence the Robinson defendants based on their own conduct and relevant characteristics, but should give substantial weight to the context of their unlawful conduct: their participation in the January 6 riot.

The Robinson defendants pleaded guilty to Count Four of the Information, charging each with Parading, Demonstrating, and Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a) do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants

---

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan).

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).

The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished

already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

- **Jeffrey Register**, 21-cr-349 (TJK), played a similar role in the January 6 riot to the Robinsons, specifically with respect to the mob that swarmed the Speaker's Lobby door that led to the fatal shooting of a rioter. Register entered through the Senate Wing Door at around the same time as the Robinsons; he also joined the crowd that forced its way through the Crypt; he similarly spent around 30 minutes inside the Capitol; and like the Robinsons he left only after witnessing that fatal shooting. Register helped find an alternative route to the House Chamber and joined the Robinson family in waving the crowd in the direction of the Speaker's Lobby. Register destroyed evidence from his phone and lied to the FBI during his initial interview. But each of the four Robinson defendants lied in even more aggravated ways, making statements to the FBI, post-plea agreement, that directly contradict their sworn admissions and sow doubt and false information about the nature of the attack on the Capitol—an attack that they helped turn deadly. Register pled guilty to the same offense as the Robinsons, and he was sentenced to 75 days' incarceration.

-   **Robert Packer**, 21-cr-103 (CJN), was also in the Speaker's Lobby to witness the fatal shooting, and, like the Robinson defendants, still expressed no remorse or appreciation for the consequences of his actions on that day. Packer, like the Robinsons and Register, entered through the Senate Wing Door just a few minutes after they were first breached; was in the Crypt when the rioters broke the police line; made his way to the Speaker's hallway near (though not inside) Nancy Pelosi's office; and only left when he witnessed the fatal shooting of another rioter. Packer also pled guilty to the same offense as the Robinsons. The court imposed a sentence of 75 days' incarceration. Unlike the Robinson defendants, Packer did not summon the mob to the Speaker's Lobby door, but instead he followed the Robinsons' lead and arrived there, toward the back, after the crowd had already amassed. All of the Robinsons therefore surely warrant a sentence greater than Packer's 75 days.

-   **Thomas Baranyi**, 21-cr-62 (JEB), also followed a similar path to the Robinsons, entering around the same time; breaking through the Crypt; joining the mob at the House chamber door; and following the Robinsons down the hallway to the Speaker's Lobby door, where he also watched from close proximity as other rioters smashed the windows and Ashli Babbitt was fatally shot. Like the Robinsons, this did not dissuade Baranyi from his purpose; he left the Capitol but remained defiant, giving an interview proudly defending his conduct. Baranyi made plans to return to Washington, D.C. for the inauguration, but he was arrested before that occurred. He pled guilty to a Class A misdemeanor, in violation of 18 U.S.C. § 1752(a)(1), and the Sentencing Guidelines therefore applied in his case. Baranyi was sentenced to 90 days' incarceration.

A sentence of 90 days' incarceration for Linwood Sr., Linwood II, and Brittany, and 120 days for Benjamin, is appropriate in light of these similar cases. The Robinsons' conduct is in many ways more aggravated. All four Robinson defendants, despite their proximity to the fatal

42

shooting in the Speaker's Lobby and their contribution to that tragedy, have expressed no remorse or even recognition for the damage they have caused. And Benjamin, alone among his co-defendants and unlike Register, Packer, and Baranyi, engaged in violence when he pounded at the Speaker's Lobby door after the mob he was part of had forced the police officers there to retreat. This sets Benjamin apart and warrants a longer period of incarceration in his case.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.[8]

---

[8] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. The courts have

## V.     Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[9] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

---

consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

[9] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," and any offense "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that each defendant must pay $500 in restitution, which reflects in part the role the Robinson defendants played in the riot on January 6.[10] ECF 67, 70, 73, 76 (Plea Agreements) at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* The Robinsons' restitution payments must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSRs, ECF 79, at ¶ 86 (Linwood Sr.); ECF 88, at ¶ 84 (Linwood II); ECF 90, at ¶ 84 (Benjamin); ECF 92, at ¶ 86 (Brittany).

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Linwood Robinson Sr., Linwood Robinson II, and Brittany Robinson to 90 days' incarceration and Benjamin Robinson to 120 days' incarceration; and sentence each of the Robinson defendants to 36 months' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes

---

[10] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

respect for the law, and deters future crime by imposing meaningful restrictions on each of the

Robinson defendant's liberty as a consequence of their criminal behavior.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      s/ *Emily W. Allen*
Emily W. Allen, CA Bar No. 234961
Anthony Franks, MO Bar No. 50217MO
Assistant United States Attorneys
District of Columbia
601 D Street NW, Washington DC 20530
(907) 271-4724
emily.allen@usdoj.gov